# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. CR607-10 |
| | ) |
| TONY LAVAUGHN LARISCY, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Defendant, who is charged with the unlawful possession of a submachine gun and a silencer, has filed a motion to suppress the evidence found in his vehicle at the time of his arrest and certain statements he made to the arresting officers. (Docs. 14, 19.) The Court held a hearing on these matters, at which time the government offered testimony from Corporals Kelley and Bell of the Screven County Sheriff's Department and Agent Randall Beach of the ATF. The defense offered testimony from Investigator William Crockett, also of the Screven County Sheriff's Department. Defendant did not testify. For the following reasons, defendant's motion to suppress should be **DENIED**.

## I. FACTUAL FINDINGS

On the night of January 11, 2007, at approximately 11:30 p.m., Cpls. Kelley and Bell responded to a domestic dispute call at defendant's home, located along Highway 301 in a rural area of Screven County. Cpl. Kelley, the first officer to arrive, saw defendant standing near a vehicle in the driveway. Kelley asked him the nature of the problem. Defendant, who was clearly intoxicated, stated that he and his girlfriend had had an argument. Mary Smith, defendant's girlfriend, then exited the house through the garage and approached Cpl. Kelley. She informed Kelley that she had decided to end her relationship with defendant and needed the sheriff's department to keep him away from her long enough for her to gather her belongings and leave. Defendant's parents then arrived, apparently hoping to defuse the situation. While Kelley was speaking with defendant's father, Cpl. Bell arrived at the residence. The deputies asked the father to remove defendant from the property and to prevent him from driving because he was heavily intoxicated. Defendant soon left the premises with his parents. Kelley and Bell departed shortly thereafter.

Less than an hour later, at approximately 12:30 a.m. on January 12,

2

a second call came in from the same address. Cpls. Bell and Kelley drove back toward defendant's home. As they approached the property, they spotted a small white pickup truck driving along an access road running parallel to the main highway.[1] The truck was headed south, away from the defendant's property. It abruptly stopped next to a neighbor's driveway, some 150 yards south of defendant's driveway. Cpl. Bell noticed that defendant was driving the vehicle. After the truck stopped, Bell saw defendant exit and flee into the woods on the west side of the access road, the side opposite the highway.

Rather than directly pursuing defendant, Cpl. Bell instructed Cpl. Kelley to keep the pickup under observation while he approached defendant's home to speak with Ms. Smith. She told him that defendant had returned to the house and had tried to kick in the door. She also told him that defendant may be armed with a pistol, for he often kept a weapon in his truck. Bell and Kelley then walked down the access road toward the white pickup truck. After determining that the pickup was unoccupied, the deputies heard some rustling in the woods and began to search for

---

[1] The access road connected the driveways of several of the residences located along Highway 301.

defendant in the dark.² Cpl. Kelley soon spotted defendant as he exited the woods between the two deputies. He shined his flashlight on defendant and told him "let me see your hands," but defendant made no response. Only after Kelley repeated the command did defendant comply with this instruction. Kelley noticed that defendant was agitated and still smelled of alcohol at this time.

Cpl. Kelley approached defendant and asked him what he was doing. Defendant stated that he drove home to recover some important paperwork he had left in a truck.³ Cpl. Bell placed defendant under arrest for driving under the influence and escorted him back toward the parked patrol cars. After a frisk of defendant revealed no weapons on his person, Cpl. Bell ordered Kelley to perform a search of defendant's vehicle incident to his arrest.⁴ Kelley entered the vehicle, where he located several beer cans, a

---

² Defendant asserts that Kelley and Bell shouted out to him that he was "gonna be in trouble" if he didn't come out. (Doc. 19 at 9.) The officers insist, however, that they did not call out because it would have been foolish to give away their position to a possibly armed man.

³ It is unclear which truck defendant was referring to. Cpl. Kelley had noticed a large pickup truck on the defendant's property when he arrived for the first call, but he did not see the smaller white truck that defendant was driving shortly before his arrest.

⁴ Cpl. Kelley testified that he searched the pickup truck incident to defendant's arrest and for the purposes of inventorying a vehicle that he anticipated would be towed from the scene. Cpl. Bell testified that he intended to impound the vehicle because of

4

can with some cold beer remaining in it, and a briefcase. Inside the briefcase, he found what appeared to be a submachine gun with a fully loaded magazine and several extra rounds of ammunition. When Kelley produced these items to Cpl. Bell, defendant volunteered several statements regarding the weapon. He stated that it was a non-functioning "mock" gun and the bullets were just for show. At the time he made the statements, defendant had not been read his Miranda rights.[5]

Later that morning, the Screven County Sheriff's Department contacted ATF Special Agent Beach and informed him that defendant had been found with what appeared to be a fully-automatic weapon. Beach promptly responded to the call. Upon arriving at the Sheriff's Department, he analyzed the weapon and determined that it was a replica of a World War II-era 9 mm British "Sten" gun equipped with a silencer. He also found that it appeared to be fully automatic. At around 1 p.m. he

---

defendant's arrest for DUI, and because a computer check showed that defendant had no driver's license and the pickup's license plate was not assigned to that vehicle.

[5] Bell testified that while he gave defendant the implied consent warnings required by Georgia law upon the arrest of a DUI suspect, he never read defendant his Miranda rights as he never intended to question him. Cpl. Kelley, however, recollected that Bell not only gave the implied consent warnings but also read defendant his Miranda rights before questioning him. The Court credits Cpl. Bell's memory on this point, as his investigative report makes no mention of the administration of Miranda warnings, and as he would more likely remember whether or not he gave the warnings.

interviewed the defendant. Before asking any questions about the weapon, Beach explained defendant his rights and had him sign a <u>Miranda</u> waiver. Defendant appeared to be lucid and sober when he signed the waiver.

Defendant told Beach that the gun was given to him as payment for certain construction work he had done in Savannah. He said that he acquired it ten years before the arrest, but Beach noted that the firearm looked like it had been cobbled together from a "kit" in the last four to five years. Although defendant insisted that the gun did not work, he admitted to having previously fired it behind his house. Beach spent approximately thirty minutes interviewing defendant.

While Agent Beach interviewed defendant, Investigator Crockett spoke with defendant's father, who stated that the firearm had come into his possession from his father, a World War II veteran. After Beach finished interviewing the defendant, he spoke with Crockett, who conveyed the father's "family heirloom" story. Presented with these conflicting accounts, Beach confronted defendant with his father's version of the story.[6] Defendant responded "I'll take the rap."

---

[6] Beach did not repeat the <u>Miranda</u> warnings before this second interview, which occurred soon after his first encounter with defendant.

## II. ANALYSIS

### A. Search of the White Pickup Truck

The defendant argues that the search of the pickup truck after his arrest violated his rights under the Fourth Amendment. Specifically, he argues that because he had exited the vehicle voluntarily and was not in or near his truck at the time of the arrest, the search of his vehicle was inappropriate. (Doc. 19 at 3-5.) The government contends that the search was a valid search incident to arrest. (Doc. 23.)

"When an occupant of an automobile is the subject of a lawful arrest, the Fourth Amendment permits the arresting officers to contemporaneously conduct a warrantless search not only of the occupant himself, . . . but also of the passenger compartment of the automobile, as well as any closed (or open) containers found in this area of the automobile." United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996); New York v. Belton, 453 U.S. 454, 460 (1981) (announcing a bright-line rule that all areas within the passenger compartment of a vehicle are within the occupant's "immediate control" and therefore may be searched incident to his arrest). The rule announced in Belton applies to both occupants and

recent occupants of vehicles. Thornton v. United States, 541 U.S. 615, 622 (2004) (citing Belton, 453 U.S. at 460). Accordingly, the inquiry "does not turn on whether he was inside or outside the car at the moment the officer first initiated contact with him." Id.

Here, it is undisputed that defendant had exited the vehicle before his arrest. The question, then, is whether defendant was a "recent occupant" of the vehicle. The Supreme Court has provided little guidance on the matter, stating only that "an arrestee's status as a 'recent occupant' may turn on his temporal or spatial relationship to the car at the time of the arrest and search." Id.; see also United States v. Garcon, No. 07-80051-CR, 2008 WL 60405, at *11 (S.D. Fla. Jan. 3, 2008) (declining to extend Thornton to a "potential" vehicle occupant who was not the last known person to operate the vehicle).

In the instant case, the evidence weighs in favor of finding that defendant was a recent occupant of the vehicle. First, it is undisputed that defendant was the last person seen operating the pickup truck. Garcon, 2008 WL 60405, at *11. Second, Cpl. Kelley stated that defendant was approximately sixty feet away from the pickup truck when he was arrested.

In United States v. Moore, No. 2:05cr050, 2006 WL 560640, at *5 (M.D. Fla. March 7, 2006), the court held that a defendant was a recent occupant when he was arrested "approximately 90 feet from the vehicle." See also United States v. Jones, 155 F. App'x 204, 208 (6th Cir. 2005) (holding that the rule in Thornton does not require that the defendant be within reach of the automobile); United States v. Sumrall, 115 F. App'x 22, 26 (10th Cir. 2004) (holding that Thornton applies even after the defendant exited the vehicle and locked the door); but see United States v. Dickey-Bey, 393 F.3d 449, 456 (4th Cir. 2004) (reserving decision on district court's ruling that an arrest thirty feet from defendant's vehicle and fifteen minutes after defendant was "first taken down" did not justify the application of Thornton). Finally, the arrest was sufficiently temporally "near" the vehicle under Thornton. Cpl. Bell testified that defendant was arrested between 12:40 and 12:45 a.m., about fifteen minutes after the second call from the residence. The vehicle was searched immediately after the arrest. In United States v. Palmer, 206 F. App'x 357 (5th Cir. 2006), the court held that a twenty-four minute delay was not enough to prevent a court from finding that a defendant was a recent occupant of a vehicle. Id. at 359; see

also United States v. Grooms, 506 F.3d 1088, 1091 (eight minute delay not too long). Accordingly, the search was a valid search incident to arrest.

The search was also valid as an inventory search. It is well settled that police officers may conduct inventory searches of vehicles lawfully in their custody provided the inventory is conducted pursuant to standardized government procedures. Colorado v. Bertine, 479 U.S. 367, 372 (1987); United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991). There is no requirement that the policy be in writing, as long as it is a standard procedure. United States v. Griffiths, 47 F.3d 74, 78 (2d Cir. 1995). Corporal Bell indicated that he intended to impound the vehicle, and it was the customary practice of the Sheriff's Department to impound vehicles after DUI arrests. Kelley stated that the Sheriff's Department has an inventory policy in place requiring that any vehicle that is to be impounded must first be inventoried. Neither deputy's testimony was rebutted.[7] Since the vehicle and its contents were inventoried according to standard procedure, any evidence recovered is admissible.

---

[7] Inventory searches must be performed in accordance with set policy. Florida v. Wells, 495 U.S. 1, 4 (1990). Police officers are not permitted to open containers in the absence of such a policy. Id. Defendant did not contest the inventory policy in place here or the execution of that policy by the arresting deputies.

## B. Defendant's Statements to Corporals Bell and Kelley

Defendant also contends that any statements he made to Cpls. Bell and Kelley should be suppressed as the product of a "custodial interrogation." (Doc. 19.) Because the deputies did not administer Miranda warnings prior to obtaining the statements, defendant argues that his statements must be excluded pursuant to the Fifth Amendment privilege against self-incrimination. (Id.)

It is well settled that law enforcement officials may not conduct a custodial interrogation of a suspect without first advising him of the rights guaranteed by the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 471 (1966). Miranda determined that any custodial interrogation of a suspect involves "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. The Supreme Court therefore created a conclusive presumption that evidence produced by custodial interrogation is coerced unless the suspect is first informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney,

either retained or appointed," during any questioning. Id. at 444.

The Supreme Court has defined "interrogation" as encompassing "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Miranda, however, was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from "express questioning or its functional equivalent." Id. at 300-301. The protections of Miranda, therefore, do not extend to spontaneous, unprompted statements made to law enforcement officers after a suspect has been taken into custody. Miranda, 384 U.S. at 478; Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning.")

Once Cpl. Kelley completed his search of defendant's vehicle, he removed the submachine gun and ammunition and showed the items to Cpl. Bell, who had secured defendant in a patrol car. Merely displaying the

weapon to a fellow officer did not, in this context, constitute the functional equivalent of interrogation. See Young v. Sirmons, No. 00cv310, 2007 WL 2248158, at *25-29 (N.D. Okla. Aug. 2, 2007) (holding that officers' examination of evidence in presence of defendant during search of his home was not the functional equivalent of interrogation under Innis, 446 U.S. at 301, so any statements he volunteered need not be excluded under Miranda); see also United States v. Duncan, No. 05-5006, 2007 WL 4023752, at *1-2 (4th Cir. Nov. 16, 2007) (holding that innocuous statements from one police officer to another regarding the discovery of a firearm in defendant's vehicle did not implicate Miranda, as the statements were not the functional equivalent of interrogation). Accordingly, the statements that defendant volunteered during the search of the pickup truck need not be suppressed.

Nor was Cpl. Kelley required to administer Miranda warnings before asking defendant what he was doing during the initial roadside encounter. Under the "public safety exception" established by the Supreme Court in New York v. Quarles, 467 U.S. 649 (1984), "police officers [may] ask questions reasonably prompted by a concern for the public safety." Id. at

656. Here, the defendant was heavily intoxicated, and the deputies had grounds to believe that he was armed. Upon seeing the patrol cars approach, defendant suspiciously exited his vehicle and fled into the woods. Considering the volatile situation, it was certainly reasonable for the deputies to believe that the defendant might pose an immediate danger to them or to a passer-by. Accordingly, Cpl. Kelley's question was justified under the circumstances. Id.; United States v. Fox, 393 F.3d 52, 60 (1st Cir. 2004).

## III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress should be **DENIED**.

**SO REPORTED AND RECOMMENDED** this __12th__ day of February, 2008.

/s/ G.R. SMITH
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA